Present:  All the Justices

COMMONWEALTH OF VIRGINIA

                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 011728              June 7, 2002

KEVIN LAMONT HICKS

                    FROM THE COURT OF APPEALS OF VIRGINIA

     The narrow issue that we consider in this appeal is whether a redevelopment and housing authority's trespass policy is overly broad and thereby violates the First and Fourteenth Amendments to the Constitution of the United States.

                                   I.

     Kevin Lamont Hicks was charged with trespass in violation of Code § 18.2-119 and three violations of the conditions of suspended sentences imposed upon him for prior trespass convictions.  He was tried and convicted in the City of Richmond General District Court.

     Hicks appealed the convictions to the Circuit Court of the City of Richmond, and he filed a motion to dismiss the charges against him on the basis that a redevelopment and housing authority's trespass policy contravened the First and Fourteenth Amendments to the Constitution of the United States.  The circuit court denied the motion.  At the conclusion of a bench trial, Hicks was convicted of trespass

and sentenced to 12 months in jail, which was suspended.  The circuit court also revoked Hicks' prior suspended sentences.

Hicks appealed the judgment to the Court of Appeals.  A panel of the Court of Appeals affirmed the judgment, Hicks v. Commonwealth, 33 Va. App. 561, 535 S.E.2d 678 (2000), but the Court of Appeals en banc disagreed with the panel and vacated Hicks' conviction because the redevelopment and housing authority's trespass policy contravened the First and Fourteenth Amendments to the Constitution of the United States.  Hicks v. Commonwealth, 36 Va. App. 49, 52, 548 S.E.2d 249, 251 (2001).  The Commonwealth appeals.

## II.

The Richmond Redevelopment and Housing Authority (Housing Authority) is a political subdivision of the Commonwealth of Virginia.  The Housing Authority owns and operates a housing development in the City of Richmond for low income residents known as Whitcomb Court.  The City of Richmond owned the streets located within Whitcomb Court.

In an effort to eradicate illegal drug activity in Whitcomb Court, which was described as an "open-air drug market," the Housing Authority sought to deny access to its property to persons who did not have legitimate reasons to visit the housing development.  The majority of persons who

2

had been arrested for drug crimes at the Whitcomb Court housing development were individuals who did not reside there.

The Richmond City Council enacted an ordinance that "closed to public use and travel and abandoned as streets of the City of Richmond," streets in Whitcomb Court because those streets were "no longer needed for the public convenience." The City conveyed the streets by a recorded deed to the Housing Authority.

The deed required that the Housing Authority "make provisions to give the appearance that the closed streets, particularly at the entrances, are no longer public streets and that they are in fact private streets."  The Housing Authority's employees affixed red and white signs to each apartment building in Whitcomb Court.  The signs are also located "every 100 feet" along the streets in Whitcomb Court and are "approximately 18 inches to almost 24 inches by about 12 inches" in size.  The signs state:

"NO TRESPASSING

"PRIVATE PROPERTY

"YOU ARE NOW ENTERING
PRIVATE PROPERTY AND
STREETS OWNED
BY RRHA.

"UNAUTHORIZED PERSONS
WILL BE SUBJECT TO
ARREST AND PROSECUTION.

3

"UNAUTHORIZED
VEHICLES WILL BE TOWED
AT OWNERS EXPENSE."

The Housing Authority, in its capacity as owner of the private streets, authorized

> "each and every Richmond Police Department officer to serve notice, either orally or in writing, to any person who is found on Richmond Redevelopment and Housing Authority property when such person is not a resident, employee, or such person cannot demonstrate a legitimate business or social purpose for being on the premises.  Such notice shall forbid the person from returning to the property.  Finally, Richmond Redevelopment and Housing Authority authorizes Richmond Police Department officers to arrest any person for trespassing after such person, having been duly notified, either stays upon or returns to Richmond Redevelopment and Housing Authority property."

As a part of the Housing Authority's unwritten policies, Gloria S. Rogers, the Housing Authority's housing manager for Whitcomb Court, was required to determine whether a person can demonstrate a legitimate business or social purpose to use the Housing Authority's property.  Pursuant to these policies, individuals who sought access to the Housing Authority's property, including the streets, needed to obtain Rogers' permission for such access.  Rogers stated that if a person desired to disseminate materials or participate in an activity on the property, that person must obtain her authorization. Sometimes, she referred such request to a "community council" which met with "the Board and the residents."  She also

4

testified that if an individual submitted a request to distribute flyers and the request was not "routine," she referred that request to the Housing Authority's director of housing operations for resolution. The Housing Authority, however, has not promulgated any written policies or procedures that govern decisions regarding who may distribute materials or participate in activities on the Housing Authority's property.

Pursuant to the Housing Authority's unwritten policies, an individual who is not authorized to use the Housing Authority's property and does so is warned by the Richmond Police Department. The Housing Authority forwards a letter to that individual informing him that he may not lawfully return to the property.

On January 20, 1999, Richmond police officer James J. Laino, who was driving a police car on Bethel Street, observed Hicks, who was walking on a sidewalk on that street. Bethel Street is one of the streets that the City conveyed to the Housing Authority and that street is located entirely within Whitcomb Court.

Laino, who had known Hicks for about four years, approached him. Laino knew that Hicks had been notified that he was barred from the Housing Authority's property. Laino

5

informed Hicks that he was "not supposed to be out here," and Laino issued a summons to Hicks for trespass.

Rogers had also spoken with Hicks on two prior occasions and told him that he could not appear on the Housing Authority's property. Hicks had been arrested on two prior occasions for trespass on the Housing Authority's property. On April 14, 1998, Hicks signed a letter that was hand delivered to him by Rogers. The letter, which the parties describe as a barment notice, states in part:

> "This letter serves to inform you that effective immediately you are not welcome on Richmond Redevelopment and Housing Authority's Whitcomb Court or any Richmond Redevelopment and Housing Authority property. This letter is an official notice informing you that you are not to trespass on RRHA property. If you are seen or caught on the premises, you will be subject to arrest by the police."

### III.

#### A.

The Commonwealth argues that Hicks is not entitled to challenge the constitutional validity of the Housing Authority's practices or policies in the criminal prosecution for trespass. The Commonwealth contends that Hicks instead was required to challenge the barment notice he received from the Housing Authority or the Housing Authority's policies and practices, presumably in a separate proceeding. We disagree.

6

In this case, Hicks has asserted a constitutional challenge to a conviction. Hicks pled in a written pretrial motion that the Housing Authority's trespass procedures and policy violated the First Amendment. At trial, Hicks argued that the Housing Authority's trespass procedures and policy were unconstitutional.

Contrary to the Commonwealth's assertions, Hicks was not required to file a civil proceeding to challenge the Housing Authority's trespass policies and practices. Rather, this defendant was entitled to challenge the validity of his conviction on the basis that the Housing Authority's practices and procedures contravened his constitutional rights. We observe that in other contexts, we have permitted defendants to assert constitutional challenges to convictions in criminal prosecutions, see, e.g., Remington v. Commonwealth, 262 Va. 333, 344-45, 551 S.E.2d 620, 628 (2001); McCain v. Commonwealth, 261 Va. 483, 489-90, 545 S.E.2d 541, 544-45 (2001); Lenz v. Commonwealth, 261 Va. 451, 460-62, 544 S.E.2d 299, 304-05 (2001); Burns v. Commonwealth, 261 Va. 307, 321-23, 541 S.E.2d 872, 882-83 (2001); Pitt v. Commonwealth, 260 Va. 692, 695-96, 539 S.E.2d 77, 78-79 (2000). We also note that the Supreme Court has permitted criminal defendants to assert constitutional challenges to various ordinances in

7

criminal prosecutions.  See, e.g., Lovell v. City of Griffin,
303 U.S. 444, 452 (1938).

B.

Hicks argued in the Court of Appeals, and he argues here,
that the Housing Authority's trespass procedures are overly
broad and, therefore, violate fundamental constitutional
rights to freedom of speech guaranteed by the First Amendment
to the Constitution of the United States.  Responding, the
Commonwealth contends that the Housing Authority's trespass
policy is not overly broad.  The Commonwealth also asserts
that a defendant who raises a facial constitutional challenge
must demonstrate a substantial risk that the application of
the challenged policy will result in suppression of protected
speech.

The First Amendment states in part that "Congress shall
make no law . . . abridging the freedom of speech."  The
Supreme Court has stated that this "freedom is among the
fundamental personal rights and liberties which are protected
by the Fourteenth Amendment from invasion by state action; and
municipal ordinances adopted under state authority constitute
state action."  Staub v. City of Baxley, 355 U.S. 313, 321
(1958); accord Palko v. Connecticut, 302 U.S. 319, 324-25
(1937), overruled on other grounds, Benton v. Maryland, 395

8

U.S. 784, 794 (1969); Stromberg v. California, 283 U.S. 359, 368 (1931); Gitlow v. New York, 268 U.S. 652, 666 (1925).

The Supreme Court has held that in the context of a First Amendment challenge, a litigant may challenge government action granting government officials standardless discretion even if that government action as applied to the litigant is constitutionally permissible. For example, the Supreme Court stated in Los Angeles Police Department v. United Reporting Publishing Corp., 528 U.S. 32, 38 (1999):

> "The traditional rule is that 'a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.' New York v. Ferber, 458 U.S. 747, 767 (1982) (citing Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)).
> "Prototypical exceptions to this traditional rule are First Amendment challenges to statutes based on First Amendment overbreadth. 'At least when statutes regulate or proscribe speech . . . the transcendent value to all society of constitutionally protected expression is deemed to justify allowing "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." ' Gooding v. Wilson, 405 U.S. 518, 520-521 (1972) (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)). 'This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression.' Gooding v. Wilson, [405 U.S.] at 520-521. See also Thornhill v. Alabama, 310 U.S. 88 (1940)."

9

The Supreme Court has also pointed out that the overbreadth doctrine is "strong medicine" and this doctrine should be employed "sparingly and only as a last resort."  Broadrick, 413 U.S. at 613.

The Supreme Court has consistently and repeatedly invalidated government policies that facially vested officials with broad and unfettered discretion to regulate speech.  See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153 (1969) (invalidating ordinance requiring marchers to seek permission from mayor); Kunz v. New York, 340 U.S. 290, 293-94 (1951) (invalidating ordinance prohibiting public worship without a permit from police commissioner); Saia v. New York, 334 U.S. 558, 559-61 (1948) (invalidating ordinance that required operators of sound trucks to obtain permission from police chief).

The Supreme Court stated in City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 763-64 (1988):

> "[A] law or policy permitting communication in a
> certain manner for some but not for others raises
> the specter of content and viewpoint censorship.
> This danger is at its zenith when the determination
> of who may speak and who may not is left to the
> unbridled discretion of a government official.  [W]e
> have often and uniformly held that such statutes or
> policies impose censorship on the public or the
> press, and hence are unconstitutional, because
> without standards governing the exercise of
> discretion, a government official may decide who may
> speak and who may not based upon the content of the
> speech or viewpoint of the speaker.  E.g., Cox v.

10

Louisiana, 379 U.S. [536], 557 [(1965)]; Staub, 355 U.S. at 322. Therefore, even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion. It bears repeating that '[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether . . . his conduct could be proscribed by a properly drawn statute, and whether . . . he applied for a license.' Freedman [v. Maryland], 380 U.S. [51], 56 [(1965)]."

In Lakewood, the Supreme Court applied these principles and invalidated a city ordinance that permitted a mayor to grant or deny a permit to a publisher who desired to place a news rack on a sidewalk. The ordinance placed no limits on the mayor's discretion to grant or deny the requested permit. The Supreme Court stated that this lack of limitations upon an official's discretion "renders the guarantee against censorship little more than a high sounding ideal." 486 U.S. at 769-70.

In Staub, supra, the Supreme Court invalidated an ordinance that permitted a mayor and a city council to grant or deny a permit to a labor union allowing it to solicit members based upon the "effects upon the general welfare of citizens of the City of Baxley." The Court stated:

"These criteria are without semblance of definitive standards or other controlling guides governing the action of the Mayor and Council in granting or

11

withholding a permit. Cf. Niemotko v. Maryland, 340 U.S. 268, 271-273 [(1951)]. It is thus plain that they act in this respect in their uncontrolled discretion.

"It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official – as by requiring a permit or license which may be granted or withheld in the discretion of such official – is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."

355 U.S. at 322. And, in Schneider v. State, 308 U.S. 147, 163-64 (1939), the Supreme Court invalidated a city ordinance that banned "communication of any views or the advocacy of any cause from door to door" without a written permit from the chief of police. The Court held that the ordinance was a restraint upon First Amendment rights and stated that the ordinance "strikes at the very heart of the constitutional guarantees." Id. at 164.

We also observe that in Lovell, supra, the Supreme Court invalidated a city ordinance that prohibited the distribution of circulars, handbooks, advertising, or literature of any kind without first obtaining written permission from the city manager of the City of Griffin. Alma Lovell, who was convicted for violation of this criminal ordinance and sentenced to imprisonment, asserted that the ordinance was facially invalid. The Court observed:

12

"We think that the ordinance is invalid on its face.  Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship.  The struggle for the freedom of the press was primarily directed against the power of the licensor.  It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.'  And the liberty of the press became initially a right to publish 'without a license what formerly could be published only with one.'  While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. . . .  Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form."

303 U.S. at 451-52 (footnote omitted).

Applying the principles established by the Supreme Court, we hold that the Housing Authority's trespass policy is invalid because it is overly broad and it infringes upon First Amendment protections.  Even though the Housing Authority's trespass policy, which is written in part and unwritten in part, is designed to punish activities that are not protected by the First Amendment, the policy also prohibits speech and conduct that are clearly protected by the First Amendment.  Also, we note that Hicks is entitled to assert a facial constitutional challenge to the Housing Authority's trespass policy even though a portion of that policy is unwritten.  To hold otherwise would permit the government to violate a

13

citizen's First Amendment protections by simply refusing to memorialize unconstitutional policies in a written document. We observe that the United States Supreme Court and the various United States Courts of Appeals have permitted litigants to assert First Amendment facial challenges to unwritten government policies.  See Niemotko v. Maryland, 340 U.S. at 271-73 (unwritten practice of issuance of licenses to use a public park for meetings); Wells v. City & County of Denver, 257 F.3d 1132, 1150-51 (10th Cir.); cert. denied, ___ U.S. ___, 122 S.Ct. 469 (2001) (unwritten policy that banned unattended holiday displays); Lebron v. AMTRAK, 69 F.3d 650, 659, amended by 89 F.3d 39, 39 (2d Cir. 1995) (unwritten policy that banned political advertisements); Tipton v. University of Hawaii, 15 F.3d 922, 927-28 (9th Cir. 1994) (unwritten policy "as manifested in the University's application of its written policy"); Sentinel Communications Co. v. Watts, 936 F.2d 1189, 1197-99 (11th Cir. 1991) (unwritten scheme for regulating the placement of newspaper racks).

Rogers, the Housing Authority's housing manager for Whitcomb Court, testified that the Housing Authority has not implemented written procedures or guidelines concerning the enforcement of the trespass policy.  The Housing Authority has not implemented any guidelines that delineate how an

14

individual may obtain permission to use the property.  Even though "authorized" persons may use the Housing Authority's property, Rogers, in the exercise of her unfettered discretion, is the government official who determines whether an individual is authorized.

Rogers also has unfettered discretion to determine who can distribute literature at the Whitcomb Court housing development and, pursuant to the Housing Authority's unwritten trespass policy, a non-resident of Whitcomb Court can only distribute such literature if that non-resident obtains authorization from Rogers.  Rogers testified that she will permit non-residents to distribute material only if she is "used to seeing" the material.  Rogers testified as follows:

> "Question:  If an organization wanted to use the privatized street or sidewalk in a housing community in order to hold some sort of demonstration, in order to walk back and forth with signs in support of some sort of political position, would they be permitted on the property if they were nonresidents?

> "Answer:  They could get permission first.  And I would say, again, I need it in writing to see the nature or whatever.  They need permission first to be on the property.

> "Question:  Are you in a position – does your position enable you to tell people – to give people permission to come on and picket or demonstrate on housing community property?

> "Answer:  I'm not sure what you're asking.  To picket?  I've had people to call to pass out flyers,

and asked to have church services.  And these are things I'm used to.

"As far as picketing and stuff, I never had that so I'm not familiar with it.

"Question:  Let's talk about what you're used to.

"Answer:  Okay.

"Question:  With situations such as those, people wanting to pass out flyers for example, or hold church related meetings, do they have to come to you for permission?

"Answer:  Yes.

"Question:  Then do you give permission?

"Answer:  Depending on the circumstances, sometimes it's granted, yes.

"Question:  Sometimes you do and sometimes you don't?

"Answer:  Correct."

Based upon the record before this Court, Rogers has the unfettered discretion to determine not only who has a right to speak on the Housing Authority's property, but she may prohibit speech that she finds personally distasteful or offensive even though such speech may be protected by the First Amendment.  She may even prohibit speech that is political or religious in nature.  However, a citizen's First Amendment rights cannot be predicated upon the unfettered discretion of a government official.

16

We recognize that the Court of Appeals decided this case on the basis that the Housing Authority's private streets constitute a public forum and that the Housing Authority's efforts to regulate speech in that forum contravene the First Amendment.  In view of our limited holding, we need not resolve this issue and, thus, we will vacate that portion of the judgment of the Court of Appeals, and we will reserve consideration of this issue for another day.  Also, we need not, and we do not, express any views regarding the litigants' remaining contentions.

                                IV.

We will affirm the judgment of the Court of Appeals on the narrow basis that the Housing Authority's trespass policy is overly broad and that Hicks may assert this issue in this criminal prosecution.

<u>Affirmed in part</u>,
<u>vacated in part</u>,
<u>and final judgment</u>.

JUSTICE KINSER, with whom JUSTICE LEMONS joins, concurring in part and dissenting in part.

Today, the majority holds that the trespass policy of the Richmond Redevelopment and Housing Authority (the Authority) is "overly broad and . . . infringes upon First Amendment protections" because the Authority's housing manager, according to the majority, has "unfettered discretion" to

17

determine whether an individual is authorized to be on the Authority's property. The majority reaches this issue by allowing the defendant to make a facial challenge to the Authority's trespass policy. I do not believe that such a challenge is permissible in this case.

A facial challenge to a statute, or in this case, to the trespass policy, can proceed under two different doctrines. "First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.' " City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)). Under the second doctrine, even if a statute is not overbroad (i.e., it "does not reach a substantial amount of constitutionally protected conduct"), "it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." Id. (citing Kolender v. Lawson, 461 U.S. 352, 358 (1983)).

The majority utilizes the overbreadth doctrine to find the trespass policy unconstitutional on its face. Explaining the defendant's standing, the majority states that, "in the

context of a First Amendment challenge, a litigant may challenge government action granting government officials standardless discretion even if that government action as applied to the litigant is constitutionally permissible." The majority intertwines its examination of the standing issue and its substantive analysis of the trespass policy, and in doing so, uses its view that the trespass policy grants unfettered discretion to the housing manager to decide who can come onto the Authority's property to support its conclusion that the defendant has standing to make a facial challenge. In other words, the majority does not separate the question of standing from its substantive First Amendment ruling.

To support this finding of unfettered discretion and thus standing, the majority relies upon a line of cases involving prior restraints upon the exercise of First Amendment rights. Each of the cases cited by the majority addressed a statute requiring a license or permit to engage in First Amendment activity. See, e.g., City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 769 (1988) (invalidating ordinance requiring publishers to obtain permit from mayor for placing newsracks on sidewalk); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153 (1969) (invalidating ordinance requiring marchers to seek permission from city commission); Staub v. City of Baxley, 355 U.S. 313, 321 (1958)

(invalidating ordinance requiring labor unions to seek permit from mayor and city council for solicitation of members); Kunz v. New York, 340 U.S. 290, 293-94 (1951) (invalidating ordinance prohibiting public worship without permit from police commissioner); Saia v. New York, 334 U.S. 558, 560-61 (1948) (invalidating ordinance that required operators of loud-speakers and amplifiers to obtain permission from police chief); Schneider v. State, 308 U.S. 147, 162-64 (1939) (invalidating ordinance that banned distribution of literature without written permit from chief of police); Lovell v. City of Griffin, 303 U.S. 444, 450-51 (1938) (invalidating ordinance prohibiting distribution of literature without first obtaining written permission from city manager).

Because the Authority's trespass policy does not directly regulate activity protected by the First Amendment, but instead limits access to government property, I conclude that these cases are not persuasive authority to justify the defendant's facial challenge to the trespass policy. In using these cases, the majority also assumes that the trespass policy regulates pure speech instead of conduct. This approach allows a facial challenge in this case without directly addressing the admonition of the Supreme Court of the United States that "overbreadth scrutiny has been limited with

20

respect to conduct-related regulation." New York v. Ferber,

458 U.S. 747, 766 (1982) (citing Broadrick, 413 U.S. 601).

"The traditional rule is that a person to whom a [policy] may constitutionally be applied may not challenge that [policy] on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." Id. at 767 (citing Broadrick, 413 U.S. at 610). One exception to this principle is in the arena of First Amendment overbreadth. Id. at 768. However, "[b]ecause of the wide-reaching effects of striking down a statute[, or trespass policy as in this case,] on its face at the request of one whose own conduct may be punished despite the First Amendment," the First Amendment overbreadth doctrine has been recognized as "strong medicine" and is employed "with hesitation, and then 'only as a last resort.' " Id. at 769 (quoting Broadrick, 413 U.S. at 613). As explained in Broadrick:

> facial overbreadth adjudication is an exception to [the] traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct – even if expressive – falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.

413 U.S. at 615. Thus, the Court has held that "where conduct and not merely speech is involved, . . . the overbreadth of a

21

statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Ferber*, 458 U.S. at 770 (quotation marks omitted).

The Authority's trespass policy is found in the "Authorization" given to the Richmond Police Department to enforce the trespass laws of the Commonwealth of Virginia upon the Authority's public housing property. An individual may be banned from the Authority's property if that individual "is not a resident, employee, or such person cannot demonstrate a legitimate business or social purpose for being on the premises." After receiving either written or oral notice that he or she cannot return to the Authority's property, that person may then be arrested for trespass if he or she "either stays upon or returns" to the Authority's property.

By its terms, this policy is directed at conduct, namely trespassing, and not pure speech. Cf. *Cox v. Louisiana*, 379 U.S. 559, 581 (1965) (Black, J., concurring in part and dissenting in part) ("Standing, patrolling, or marching back and forth on streets is conduct, not speech, and as conduct can be regulated or prohibited."); *Local 391 v. City of Rocky Mount*, 672 F.2d 376, 379 (4th Cir. 1982) (picketing is a hybrid of speech and conduct). The policy is not aimed at censoring particular groups or viewpoints, or prohibiting individuals from distributing leaflets on the property. Nor

is it intended to prevent individuals from associating with friends or family who live in Whitcomb Court. Instead, it seeks to regulate the criminal act of trespassing that violates Code § 18.2-119. In other words, the policy's legitimate sweep prohibits trespassing, an activity that is not protected by the First Amendment.

Because the trespass policy regulates conduct and not pure speech, I conclude that it must be "substantially overbroad" before it can be attacked through a facial challenge, and that whatever overbreadth may exist in the policy does not meet the threshold of "substantial overbreadth." "The concept of 'substantial overbreadth' is not readily reduced to an exact definition[, but] . . . the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984). Instead, this is "the paradigmatic case of a [policy] whose legitimate reach dwarfs its arguably impermissible applications." Ferber, 458 U.S. at 773. "[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." Broadrick, 413 U.S. at 615-16. Thus, I find that the defendant does not have standing to

23

assert a facial challenge to the Authority's trespass policy under the "overbreadth doctrine."

Nor do I believe that the defendant can make a facial challenge to the trespass policy under the "vagueness" doctrine. "A [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982); accord Parker v. Levy, 417 U.S. 733, 756 (1974); but see Morales, 527 U.S. at 55. The defendant's conduct when he was arrested for trespass clearly violated both the trespass policy and Code § 18.2-119. He had been previously banned from Whitcomb Court and had been given written notice that he was not to trespass on the Authority's property. Nevertheless, he entered upon the property on the day in question. There can be no question that this conduct was clearly proscribed.

Thus, I conclude that the defendant may only challenge the trespass policy as it was applied to him. Before turning to that issue, I am compelled to point out that, if a facial challenge is to be allowed in this case, it should be analyzed under the framework established by the Supreme Court for

24

deciding when an individual's First Amendment rights have been violated by a denial of access to government property. See United States v. Kokinda, 497 U.S. 720, 726-27 (1990).

"[T]he [U.S. Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Cornelius v. NAACP Legal Defense & Ed. Fund, 473 U.S. 788, 800 (1985). The first inquiry in this analysis is whether the particular activity at issue is speech protected by the First Amendment. Id. at 797. If it is, the nature of the forum must then be identified, "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981). The final inquiry is whether the "justifications for exclusion from the relevant forum satisfy the requisite standard." Cornelius, 473 U.S. at 797. The defendant agrees that this analytical framework applies in this case, as reflected by his statement on brief that, "[i]n determining whether [the Authority's trespass policy] is

25

permissible, this Court must first define the areas affected by the regulation."

Returning to the issue regarding the constitutionality of the trespass policy as applied to the defendant, I find that the only constitutional right that the defendant could have been asserting when he entered upon the Authority's property for the purpose of bringing diapers to his son was his right of association under the Fourteenth Amendment. See Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987) (constitutional protection afforded to freedom of association in two distinct areas: freedom to enter into and maintain certain intimate or private relationships, and freedom to associate for purpose of engaging in protected speech or religious activities). Although the defendant argues that his conviction for trespassing violated his First Amendment rights of speech and association, and his Fourteenth Amendment right of intimate association, he was not engaged in speech or expressive association on the day in question. Thus, I conclude that the defendant's claim must be analyzed under the Fourteenth Amendment rather than the First Amendment. See Thompson v. Ashe, 250 F.3d 399, 406-07 (6th Cir. 2001). Consequently, it is not necessary to engage in a forum analysis, as the Court of Appeals did. As I previously explained, the first step in that analysis is whether the

particular activity at issue is speech protected by the First Amendment.  <u>Cornelius</u>, 473 U.S. at 797.  When it is not, as in this case, then it is not necessary to determine the nature of the forum.

In determining whether the Authority's trespass policy impermissibly infringes upon the defendant's freedom of association under the Fourteenth Amendment, it is necessary to decide first whether the defendant's asserted purpose for being on the Authority's property, i.e., to take diapers to his child, involved the exercise of a fundamental right.  The Supreme Court has recognized a fundamental right of privacy that includes the freedom to enter into and maintain certain intimate relationships.  <u>See, e.g.</u>, <u>Zablocki v. Redhail</u>, 434 U.S. 374, 383-86 (1978) (constitutional protection of marriage); <u>Carey v. Population Servs. Int'l</u>, 431 U.S. 678, 684-85 (1977) (right to choose whether to bear children); <u>Moore v. City of East Cleveland</u>, 431 U.S. 494, 506 (1977) (right to cohabitate with certain family members); <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 534-35 (1925) (parents' right to send children to private school); <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399-400 (1923) (parents' right to have children instructed in foreign language).  However, the Court has not characterized the provision of diapers or visitation with family members as the exercise of fundamental rights.  <u>See</u>

27

Thompson, 250 F.3d at 407. Therefore, the trespass policy as applied to the defendant must be judged under the rational basis test. See Vacco v. Quill, 521 U.S. 793, 799 (1997) (when legislation does not burden a fundamental right, it will be upheld "so long as it bears a rational relation to some legitimate end"). Under that standard of review, the trespass policy need only be rationally related to a legitimate governmental purpose, and the Court cannot "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." Heller v. Doe, 509 U.S. 312, 319 (1993) (quoting City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam)).

I conclude that the Authority's trespass policy passes constitutional muster under this test. The undisputed purpose of the policy is to create a safe, drug-free environment for the residents of Whitcomb Court. It cannot be questioned, in my view, that the prevention of crime in public housing is a legitimate governmental goal. See Department of Hous. & Urban Dev. v. Rucker, ___ U.S. ___, 122 S.Ct. 1230, 1232 (2002) (recognizing "reign of terror" imposed by criminal activity in public housing). The policy of banning individuals who are not residents or employees of the Authority, or who cannot demonstrate a legitimate business or social purpose for coming onto the premises, is rationally related to, and advances, the

legitimate governmental goal of preventing crime in public housing. Charging individuals with trespass when they enter upon the Authority's property after having been banned, as in the case of the defendant, also advances that goal. It must be remembered that the defendant is challenging his conviction for trespass in this appeal, not his barment from the Authority's property.

Based on the record in this case and for the stated reasons, I conclude that the defendant's arrest and conviction for trespassing did not violate his right of association afforded under the Fourteenth Amendment. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the defendant's conviction.[*]

Because I agree with section III(A) of the majority opinion, I respectfully concur in part and dissent in part.

---

[*] On brief, the defendant asserts a freedom to "loiter" based on a statement in a portion of Morales in which three justices joined, 527 U.S. at 53. He did not raise this specific argument before the trial court and is, therefore, precluded from doing so on appeal. See Rule 5:25.