Present: Hassell, C.J., Koontz, Kinser, Lemons, Agee,[1] and
         Goodwyn, JJ., and Lacy, S.J.

JEREMY JAYNES

                                            OPINION BY
v. Record No. 062388                JUSTICE G. STEVEN AGEE
                                      September 12, 2008[2]

COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA
              Upon rehearing pursuant to orders dated
                  April 28, 2008 and May 19, 2008

     Jeremy Jaynes appeals from the judgment of the Court of

Appeals which affirmed his convictions in the Circuit Court of

Loudoun County for violations of Code § 18.2-152.3:1, the

unsolicited bulk electronic mail (e-mail) provision of the

Virginia Computer Crimes Act, Code §§ 18.2-152.1 through –

152.15.  For the reasons set forth below, we will reverse the

judgment of the Court of Appeals.

          I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

     From his home in Raleigh, North Carolina, Jaynes used

several computers, routers and servers to send over 10,000 e-

mails within a 24-hour period to subscribers of America Online,

Inc. (AOL) on each of three separate occasions.  On July 16,

2003, Jaynes sent 12,197 pieces of unsolicited e-mail with

_____

     [1] Justice Agee participated in the hearing and decision of
this case prior to his retirement from the Court on June 30,
2008.
     [2] The prior opinion rendered February 29, 2008, reported at
275 Va. 341, 657 S.E.2d 478 (2008), was withdrawn by the Court
after a petition for rehearing was granted by Orders dated April
28, 2008 and May 19, 2008.

falsified routing and transmission information onto AOL's proprietary network.  On July 19, 2003, he sent 24,172, and on July 26, 2003, he sent 19,104.  None of the recipients of the e-mails had requested any communication from Jaynes.  He intentionally falsified the header information and sender domain names before transmitting the e-mails to the recipients.[3]  However, investigators used a sophisticated database search to identify Jaynes as the sender of the e-mails.[4]  Jaynes was arrested and charged with violating Code § 18.2-152.3:1, which provides in relevant part:

> A. Any person who:
> 1. Uses a computer or computer network with the intent to falsify or forge electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk electronic mail through or into the computer network of an electronic mail service provider or its subscribers . . . is guilty of a Class 1 misdemeanor.
>
> B. A person is guilty of a Class 6 felony if he commits a violation of subsection A and:
> 1.   The volume of UBE transmitted exceeded 10,000 attempted recipients in any 24-

---

[3] Simple Mail Transfer Protocol (SMTP) is what an e-mail server uses to transmit an e-mail message, and the SMTP requires verification of the sender's IP address and domain.  Evidence at trial demonstrated that Jaynes sent the e-mails with domain names which did not correspond to the domain names assigned to the sending IP addresses.

[4] Computers may be identified by their unique IP address number, which consists of blocks of numerals separated by periods.

> hour period, 100,000 attempted
> recipients in any 30-day time period,
> or one million attempted recipients in
> any one-year time period. . . .

While executing a search of Jaynes' home, police discovered a cache of compact discs (CDs) containing over 176 million full e-mail addresses and 1.3 billion e-mail user names. The search also led to the confiscation of storage discs which contained AOL e-mail address information and other personal and private account information for millions of AOL subscribers. The AOL user information had been stolen from AOL by a former employee and was in Jaynes' possession. During trial, evidence demonstrated that Jaynes knew that all of the more than 50,000 recipients of his unsolicited e-mails were subscribers to AOL, in part, because the e-mail addresses of all recipients ended in "@aol.com."[5]

An expert witness testified that the e-mails sent by Jaynes were not consistent with solicited bulk e-mail, but rather constituted unsolicited bulk e-mail (sometimes referred to as "spam" e-mail) because Jaynes had disguised the true sender and header information and used multiple addresses to send the e-mails. Other evidence at trial demonstrated that all of AOL's

---

[5] Jaynes' e-mails advertised one of three products: (1) a FedEx refund claims product, (2) a "Penny Stock Picker," and (3) a "History Eraser" product. To purchase one of these products, potential buyers would click on a hyperlink within the e-mail, which redirected them outside the e-mail, where they could

servers were located in Virginia, although some were located in Loudoun County and others were located in Prince William County.

Jaynes moved to dismiss the charges against him on the grounds that the statute violated the dormant Commerce Clause, was unconstitutionally vague, and violated the First Amendment. The circuit court denied that motion. Jaynes filed a separate motion to strike in which he challenged the jurisdiction of the circuit court. The court determined it had jurisdiction and denied the motion to strike.

A jury convicted Jaynes of three counts of violating Code § 18.2-152.3:1, and the circuit court sentenced Jaynes to three years in prison on each count, with the sentences to run consecutively for an active term of imprisonment of nine years. The Court of Appeals affirmed his convictions, Jaynes v. Commonwealth, 48 Va. App. 673, 634 S.E.2d 357 (2006). We awarded Jaynes an appeal.

## II.  ANALYSIS

Jaynes makes four assignments of error to the judgment of the Court of Appeals.  First, he assigns error to the determination that the circuit court had jurisdiction over him on the crimes charged.  Second, Jaynes contends Code § 18.2-152.3:1 "abridge[s] the First Amendment right to anonymous speech," and it was error not to reverse his convictions on that

consummate the purchase.

4

basis.  Separately, Jaynes assigns as error the failure of the Court of Appeals to hold that Code § 18.2-152.3:1 is void for vagueness.  Lastly, Jaynes posits that the statute violates the Commerce Clause of the United States Constitution.

A. JURISDICTION

Jaynes asserts that the Court of Appeals erred in holding that the circuit court had jurisdiction over him for violating Code § 18.2-152.3:1 because he did not "use" a computer in Virginia.  He contends that a violation of that statute can occur only in the location where the e-mail routing information is falsified.  Jaynes maintains that because he only used computers to send the e-mails from his home in Raleigh, North Carolina, he committed no crime in Virginia.  Further, because he had no control over the routing of the e-mails, he argues his actions did not have an "immediate result" in Virginia, and under Moreno v. Baskerville, 249 Va. 16, 452 S.E.2d 653 (1995), could not be the basis for jurisdiction over him by Virginia courts. Therefore, according to Jaynes, the circuit court had no jurisdiction over him and his convictions are void.

To successfully prosecute a crime under Code § 18.2-152.3:1(B), the Commonwealth must establish all the elements of that crime.  In addition to the element of the volume of transmissions within a specific time period, the Commonwealth must prove the sender used a computer and that such use was with

5

the intent of falsifying routing information.  The Commonwealth must also prove that the transmission of such false routing information occurred in connection with the use of an e-mail provider's computer network for that transmission.  Thus, the crime is not complete until there is e-mail transmission passing through or into the computer network of the e-mail provider or subscriber containing the false routing information.

Jaynes argues that he "merely sent e-mails that happened to be routed through AOL servers."  We disagree.  As the evidence established, all e-mail must flow through the recipient's e-mail server in order to reach the intended recipient.  By selecting AOL subscribers as his e-mail recipients, Jaynes knew and intended that his e-mails would utilize AOL servers because he clearly intended to send to users whose e-mails ended in "@aol.com."  The evidence established that the AOL servers are located in Virginia, and that the location of AOL's servers was information easily accessible to the general public.  Applying our standard of review to the evidence presented along with all reasonable inferences therefrom, we conclude that the evidence supports the conclusion that Jaynes knew and intended that the e-mails he sent to AOL subscribers would utilize AOL's servers which are located in Virginia.  Thus an intended and necessary result of Jaynes' action, the e-mail transmission through the computer network, occurred in Virginia.

Furthermore, a state may exercise jurisdiction over criminal acts that are committed outside the state, but are intended to, and do in fact, produce harm within the state. " 'It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which the evil is the fruit.' " Travelers Health Ass'n v. Commonwealth, 188 Va. 877, 892, 51 S.E.2d 263, 269 (1949) (citing Strassheim v. Daily, 221 U.S. 280, 284–85 (1911)).

Jaynes, relying on Moreno, argues that this principle, referred to as the "immediate result doctrine," is not applicable if third parties intervene between the out-of-state conduct and the in-state harm. In Moreno, the defendant, while in Arizona, arranged for delivery of drugs to an accomplice in Arizona who, in turn, delivered the drugs to two other accomplices who ultimately sold the drugs in Virginia. 249 Va. at 17-18, 452 S.E.2d at 654. Noting that drug distribution is not a continuing offense and that payment is not an element of the crime of drug distribution, id. at 18-20, 452 S.E.2d at 654-55, we concluded that the discrete crime of drug distribution was committed by the defendant while in Arizona and that the ultimate sale of the drugs in Virginia was not the "immediate result" of the distribution of drugs in Arizona because the

7

subsequent distributions by Moreno's accomplices intervened. Id. at 19, 452 S.E.2d at 655.

Jaynes argues that an e-mail could be routed through a number of different mail handling networks before the e-mail reaches its destination, and that an e-mail sender cannot control the route used. Such routing, Jaynes contends, is the same type of intervention which occurred in Moreno. Therefore, according to Jaynes, the intervention of intermediate e-mail routers and servers prior to arrival of the e-mails at the AOL servers shows that the alleged harm through the AOL servers in Virginia was not the "immediate result" of Jaynes' actions in North Carolina.

Jaynes' reliance on Moreno fails because, as noted above, Jaynes' affirmative act of selecting AOL subscribers as recipients of his e-mails insured the use of AOL's computer network to deliver the e-mails and such use was the "immediate result" of Jaynes' action, regardless of any intermediate routes taken by the e-mails. Because the use of the computer network of an e-mail service provider or its subscribers is an integral part of the crime charged and because the use of AOL's e-mail servers was the "immediate result" of Jaynes' acts, we hold that Jaynes was amenable to prosecution in Virginia for a violation of Code § 18.2-152.3:1. Accordingly, the circuit court had jurisdiction over Jaynes.

8

## B. FIRST AMENDMENT OVERBREADTH

Jaynes next contends that Code § 18.2-152.3:1 is constitutionally deficient as overbroad under the First Amendment and therefore the statute cannot be enforced. He argues the Court of Appeals erred in affirming the circuit court's ruling denying his motion to dismiss on that basis.

The Court of Appeals assumed without deciding that Jaynes had standing to raise a First Amendment challenge, but concluded that Code § 18.2-152.3:1 was in the nature of a trespass statute, thereby eliminating the need to address the First Amendment issue. The Commonwealth, in addition to arguing that the Court of Appeals correctly construed the statute as a trespass statute, contends in an assignment of cross-error that Jaynes lacks standing to raise a First Amendment challenge to Code § 18.2-152.3:1 and therefore the First Amendment issues raised by Jaynes should not be considered. We will begin by addressing the issue of standing.

### 1. STANDING

Jaynes does not make a pure facial challenge to Code § 18.2-152.3:1 as he does not argue "that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Similarly, Jaynes does not make an "as-applied challenge" to the statute, meaning he does not contend the application of the statute to

9

the actual acts for which he was convicted violates the First Amendment. See Gonzales v. Carhart, 550 U.S. ___, ___, 127 S.Ct. 1610, 1638-39 (2007) (comparing facial and as-applied challenges). Instead, Jaynes challenges the statute by claiming it is unconstitutional as overbroad. See Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) ("Hicks II").[6] That is, Jaynes contends that because the statute could potentially reach the protected speech of a third party, he (Jaynes) is entitled to claim exoneration for his otherwise unprotected speech.[7]

The Commonwealth contends Jaynes has no standing to raise a First Amendment overbreadth defense. Citing the decision of the United States Supreme Court in Hicks II, the Commonwealth argues

> there is no federal law obligation for state courts to hear facial challenges alleging overbreadth. While the question of whether a statute is overbroad is a matter of federal constitutional law, the question of who may bring a facial challenge alleging overbreadth is a matter of state law.

---

[6] Unlike a "facial" or "as-applied" challenge, an overbreadth challenge "suffices to invalidate all enforcement of that law" upon showing that the law "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " Hicks II, 539 U.S. at 118-19 (2003)(quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

[7] The Commonwealth also argues that Jaynes did not preserve this issue for appeal because he did not raise his overbreadth challenge in the circuit court. This contention is without merit. Jaynes raised it in his brief in support of his motion to dismiss, the Commonwealth addressed a facial challenge in response and the circuit court in its letter opinion labeled Jaynes' argument "a broad, general, facial First Amendment challenge."

10

. . . .

> In other words, the fact that Jaynes could bring his facial challenge alleging overbreadth in federal court is irrelevant.  The issue is whether Jaynes may bring his facial challenge alleging overbreadth in the Virginia state courts.

The Commonwealth concludes that based on Hicks II "except where there is no set of circumstances where the statute is constitutional, or where a litigant is engaged in non-commercial speech, this Court, as a matter of state law, should entertain only as-applied challenges." (citation omitted).

Jaynes responds that Hicks II does not support the rule on standing advocated by the Commonwealth.  He contends "[a]lthough Hicks [II] permits state courts to allow more facial challenges than federal law would permit, it does not authorize state courts to accept fewer facial challenges."  Citing New York v. Ferber, 458 U.S. 747, 767 (1982), Jaynes maintains that the overbreadth doctrine is a "constitutional exception to state and federal rules of standing, which ordinarily limit parties to as-applied challenges to statutes."[8]

---

[8] Jaynes' arguments as to the effect of Hicks II and response to the Commonwealth's position that states can set whatever standing rules they choose for First Amendment overbreadth claims were not made until his petition for rehearing and brief on rehearing.  Even though Jaynes failed in his opening or reply briefs to address the standing issue as presented by the Commonwealth, that issue is properly before us and we address it because the issue was raised and placed before the Court by the Commonwealth.

11

The Commonwealth bases its position on the following discussion of standing in the Hicks II opinion:

> [O]ur standing rules limit only the federal courts' jurisdiction over certain claims. State courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law. Whether Virginia's courts should have entertained this overbreadth challenge is entirely a matter of state law.

Hicks II, 539 U.S. at 120 (citation omitted) (emphasis added).

On its face, and without context, this passage from Hicks II appears to support the rule of standing advocated by the Commonwealth. In a nutshell, that rule would be that state courts are not required to apply the same standing requirements to a claimant who raises a First Amendment overbreadth challenge to a state statute in a state court as would be accorded that claimant in a federal court considering a similar First Amendment overbreadth claim. However, when viewed in the context of the standing issue actually presented in Hicks II, and the longstanding Fourteenth Amendment jurisprudence by which First Amendment rights are made applicable in state court proceedings, we disagree with the Commonwealth's arguments.

In Commonwealth v. Hicks, 264 Va. 48, 563 S.E.2d 674 (2002) ("Hicks I") this Court accorded standing to that defendant to raise a First Amendment overbreadth challenge to certain policies of the Richmond Redevelopment and Housing Authority (RRHA). 264 Va. at 55-56, 563 S.E.2d at 678-79. Hicks had been

12

banned from RRHA property because of prior trespass and property damage offenses, but continued to trespass on RRHA property. Id. at 52-53, 563 S.E.2d at 676-77. Upon his subsequent trespass arrest and conviction, Hicks asserted that he had a right to assert that the RRHA policies determining which persons would be barred from access to its properties were overbroad under the First Amendment and thus his conviction was invalid. Id. at 54, 563 S.E.2d at 677-78. Although Hicks did not contend that he had engaged in any expressive conduct or that the trespass statute under which he was convicted was invalid, this Court in Hicks I reversed his conviction because it concluded the RRHA trespass policy "also prohibits speech and conduct that are clearly protected by the First Amendment." Id. at 58, 563 S.E.2d at 680.

Upon appeal to the United States Supreme Court, the Commonwealth did "not ask the Court to abolish the overbreadth doctrine, only to place meaningful limits on its use." Brief of Petitioner, Virginia v. Hicks, No. 02-371, at 18 (Mar. 7, 2003). The Commonwealth argued on brief that "the Supreme Court of Virginia treated the [overbreadth] doctrine as if it were virtually unbounded," id. at 19, and consequently Hicks I "represents a radical expansion of the overbreadth doctrine." Id. (emphasis added). This was so, the Commonwealth argued, because the Hicks I view of overbreadth standing "has no

13

precedent in this Court's jurisprudence," id. at 21, and urged the Court to limit First Amendment overbreadth standing to persons who "at least show (1) that his own conduct involved some sort of expressive activity, and (2) that his conduct falls within the particular prohibition he challenges as overbroad." Id. at 25. Because Hicks conceded his trespass was not expressive activity and he did not challenge the trespass statute under which he was convicted as overbroad, the Commonwealth's position before the United States Supreme Court in Hicks II was that Hicks' conduct failed to meet its proposed overbreadth standing rule. At no point, on brief or in oral argument before the Supreme Court, did the Commonwealth argue the standing rule it now posits: that state courts are free to set their own standing rules in cases involving First Amendment overbreadth claims. In point of fact, as the foregoing illustrates, the Commonwealth argued the polar opposite: that state court standing rules should be constrained.

The oral argument in Hicks II makes this conclusion unmistakable and reflects the Commonwealth's clear acknowledgement of a First Amendment overbreadth rule that is directly contrary to the position it now advances in the case at bar. In discussing the Virginia Supreme Court's resolution of standing in Hicks I, the following colloquy took place between members of the Court and counsel for the Commonwealth:

14

QUESTION: The issue is whether – whether [Virginia] adopted a broader interpretation under State law than Federal law would require.

. . . .

[ANSWER]: That is correct. A – a State may well be able to adopt a broader interpretation of standing than this Court requires, but it cannot adopt a narrower interpretation. It cannot disregard this Court's direction that you give overbreadth standing according to the Federal constitutional standards. . . .

QUESTION: And if they were correct about what our standing rules are, they would have to follow those standing rules, wouldn't they? They could not apply a narrower . . . basis for standing, could they?

[ANSWER]: That is absolutely correct, Your Honor. The State supreme court has no discretion to disregard this Court's application of the First Amendment through its overbreadth doctrine.

Oral Arg. Tr., Virginia v. Hicks, No. 02-371, at 5 (Apr. 30, 2003) (emphasis added).

It is thus clear that the opinion of the United States Supreme Court in Hicks II addressed the issue of First Amendment standing only in the context by which that issue was placed before the Court: whether a state's expansion of First Amendment standing was subject to review by federal courts. When the Hicks II opinion states "[w]hether Virginia's courts should have entertained this overbreadth challenge is entirely a matter of state law," Hicks II, 539 U.S. at 120, the term "this" plainly limits the standing issue to what was before the Court in that case: an expansion, not a restriction, of state court standing.

15

Thus, read in context, the seemingly broad language about standing in the Hicks II opinion cannot have the meaning now espoused by the Commonwealth. This view is amply verified by decades of Fourteenth Amendment jurisprudence that establishes First Amendment rights, among others, as applicable in state court proceedings. In 1925, the United States Supreme Court enunciated the principle "that freedom of speech and of the press – which are protected by the First Amendment from abridgement by Congress – are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." Gitlow v. New York, 268 U.S. 652, 666 (1925); accord Stromberg v. California, 283 U.S. 359, 368 (1931) ("the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech").

The Supreme Court has also recognized that the assertion of a First Amendment overbreadth claim is not the application of a procedural rule, but a substantive part of the First Amendment. "[O]verbreadth is a function of substantive First Amendment law." Sabri v. United States, 541 U.S. 600, 610 (2004) (citing Henry P. Monaghan, Overbreadth, 1981 S.Ct. Rev. 1, 24). As a matter of substantive law, the First Amendment overbreadth doctrine is a constitutional exception to state and federal rules of standing that would otherwise limit a party to an as-

16

applied challenge to a statute.  Thus, "[a] state court is not free to avoid a proper facial attack on federal constitutional grounds."  New York v. Ferber, 458 U.S. 747, 767 (1982).

To accept the Commonwealth's view of Hicks II would permit, under the guise of standing, a state court to ignore the substantive constitutional rights of citizens in contravention of the Fourteenth Amendment.  That is an untenable position because the right to assert the protection of the First Amendment (by overbreadth or otherwise) can no more be restricted by a state rule of standing than the exclusionary rule applied to impermissible searches and seizures could be limited by state evidence law.

Thus, read in context, Hicks II does not support the argument on standing advanced by the Commonwealth.  To the contrary, as the Commonwealth expressly admitted before the United States Supreme Court, a state supreme court has no discretion to disregard the United States Supreme Court's application of the First Amendment through its overbreadth doctrine because it cannot disregard the Court's direction that overbreadth standing be given according to the Federal constitutional standards.  Oral Arg. Tr., Virginia v. Hicks, No.

17

02-371, at 5.  Accordingly, we hold Jaynes has standing to raise the First Amendment overbreadth claim.[9]

## 2.  TRESPASS

The Commonwealth argues, in the alternative, that if Jaynes has standing to raise a First Amendment overbreadth claim, that claim is not proper for consideration because his conduct was a form of trespass and thus not entitled to First Amendment protection.  Code § 18.2-152.3:1, in the Commonwealth's view, is like a trespass statute, prohibiting trespassing on the privately owned e-mail servers through the intentional use of false information and that no First Amendment protection is afforded in that circumstance.  The Court of Appeals adopted this position and held Jaynes' First Amendment argument was "not relevant."  Jaynes v. Commonwealth, 48 Va. App. 673, 693, 634 S.E.2d 357, 367 (2006).  Concluding that Code § 18.2-152.3:1 "prohibits lying to commit a trespass," id. at 693, 634 S.E.2d at 366, the Court of Appeals determined the "statute proscribes intentional falsity as a machination to make massive, uncompensated use of the private property of an ISP. Therefore, the statute cannot be overbroad because no protected speech

---

[9] The Commonwealth also argues an alternate standing rule: that standing in First Amendment overbreadth cases not extend to persons who engage only in commercial speech.  That rule was previously rejected in Bigelow v. Virginia, 421 U.S. 809, 817 (1975); see also Virginia State Bd. of Pharmacy v. Virginia

18

whatsoever falls within its purview." Id. at 693, 634 S.E.2d at 367. We disagree.

Trespass is the unauthorized use of or entry onto another's property. See e.g., Vines v. Branch, 244 Va. 185, 190, 418 S.E.2d 890, 894 (1992) ("Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass, trover, detinue, or assumpsit.") (emphasis added); Code § 18.2-119, -125, -128, -132.

Significantly, Code § 18.2-152.3:1 does not prohibit the unauthorized use of privately owned e-mail servers. The statute only prohibits the intentional use of false routing information in connection with sending certain e-mail through such servers. Thus, even if an e-mail service provider specifically allowed persons using false IP addresses and domain names to use its server, the sender could be prosecuted under Code § 18.2-152.3:1 although there was no unauthorized use or trespass. Therefore, Code § 18.2-152.3:1 is not a trespass statute.

The Commonwealth's argument that there is no First Amendment right to use false identification to gain access to private property is inapposite. First, in making this argument the Commonwealth uses the terms "false" and "fraudulent"

Citizens Consumer Council, 425 U.S. 748, 770 (1976) ("commercial speech, like other varieties, is protected").

19

interchangeably.  Those concepts are not synonymous.[10]  At issue here is the statute's prohibition of "false" routing information.  Second, the cases upon which the Commonwealth relies are civil cases between Internet service providers and the entities engaged in sending commercial unsolicited bulk e-mails: CompuServe, Inc. v. Cyber Promotions, Inc., 962 F.Supp. 1015 (S.D. Ohio 1997), Cyber Promotions, Inc. v. America Online, Inc., 948 F.Supp. 436 (E.D. Pa. 1996), and America Online, Inc. v. IMS, 24 F.Supp.2d 548 (E.D. Va. 1998).  In litigation between these private parties, the courts have held that the unauthorized use of the Internet service providers' property constituted common law trespass and that a First Amendment claim could not be raised against the owner of private property.  These cases have no relevance here because this is not a trespass action by a private property owner and the First Amendment right is not being asserted against the owner of private property, but against government action impacting the claimed First Amendment right.  Accordingly, we reject the Commonwealth's argument and hold the Court of Appeals erred in this regard.

_____

[10] Fraud involves a false representation of a material fact, made intentionally, which induces reliance on that false representation, and resulting damage.  Klaiber v. Freemason Assocs., 266 Va. 478, 485, 587 S.E.2d 555, 558 (2003).

20

### 3. CONSTITUTIONALITY OF CODE § 18.2-152.3:1

We now turn to Jaynes' contention that Code § 18.2-152.3:1 is unconstitutionally overbroad.  To address this challenge, we first review certain technical aspects of the transmission of e-mails.  In transmitting and receiving e-mails, the e-mail servers use a protocol which prescribes what information one computer must send to another.[11]  This SMTP requires that the routing information contain an IP address and a domain name for the sender and recipient of each e-mail.  Domain names and IP addresses are assigned to Internet servers by private organizations through a registration process.  To obtain an IP address or domain name, the registrant pays a fee and provides identifying contact information to the registering organization.  The domain names and IP addresses are contained in a searchable database which can associate the domain name with an IP address and vice versa.

The IP address and domain name do not directly identify the sender, but if the IP address or domain name is acquired from a registering organization, a database search of the address or domain name can eventually lead to the contact information on file with the registration organizations.  A sender's IP address or domain name which is not registered will not prevent the

_____

[11] The protocol is the product of private collaboration and not established by a governmental entity.

21

transmission of the e-mail; however, the identity of the sender may not be discoverable through a database search and use of registration contact information.[12]

As shown by the record, because e-mail transmission protocol requires entry of an IP address and domain name for the sender, the only way such a speaker can publish an anonymous e-mail is to enter a false IP address or domain name.  Therefore, like the registration record on file in the mayor's office identifying persons who chose to canvass private neighborhoods in Watchtower Bible & Tract Society v. Village of Stratton, 536 U.S. 150 (2002), registered IP addresses and domain names discoverable through searchable data bases and registration documents "necessarily result[] in a surrender of [the speaker's] anonymity."  536 U.S. at 166.  The right to engage in anonymous speech, particularly anonymous political or religious speech, is "an aspect of the freedom of speech protected by the First Amendment."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995).  By prohibiting false routing information in the dissemination of e-mails, Code § 18.2-152.3:1 infringes on that protected right.  The Supreme Court has characterized regulations prohibiting such anonymous speech as "a direct regulation of the content of speech."  Id. at 345.

---

[12] In this case Jaynes used registered IP addresses, although the domain names were false.

22

State statutes that burden "core political speech," as this statute does, are presumptively invalid and subject to a strict scrutiny test.  Under that test a statute will be deemed constitutional only if it is narrowly drawn to further a compelling state interest.  Id. at 347.  In applying this test, we must also consider that state statutes are presumed constitutional, City Council v. Newsome, 226 Va. 518, 523, 311 S.E.2d 761, 764 (1984), and any reasonable doubt regarding constitutionality must be resolved in favor of validity.  In re Phillips, 265 Va. 81, 85-86, 574 S.E.2d 270, 272 (2003).

There is no dispute that Code § 18.2-152.3:1 was enacted to control the transmission of unsolicited commercial bulk e-mail, generally referred to as SPAM.  In enacting the federal CAN-SPAM Act, Congress stated that commercial bulk e-mail threatened the efficiency and convenience of e-mail.  15 U.S.C. § 7701(a)(2).  Many other states have regulated unsolicited bulk e-mail but, unlike Virginia, have restricted such regulation to commercial e-mails.  See e.g., Ariz. Rev. Stat. § 44-1372.01; Ark. Code Ann. § 4-88-603; Cal. Bus. & Prof. Code § 17538.45; Fla. Stat. § 668.603; Idaho Code § 48-603E; Ill. Comp. Stat., tit. 815 § 511/10; Ind. Code § 24-5-22-7; Kan. Stat. Ann. § 50-6, Md. Code Ann., Commercial Law § 14-3002.  There is nothing in the record or arguments of the parties, however, suggesting that unsolicited non-commercial bulk e-mails were the target of this

23

legislation, caused increased costs to the Internet service providers, or were otherwise a focus of the problem sought to be addressed by the General Assembly through its enactment of Code § 18.2-152.3:1.

Jaynes does not contest the Commonwealth's interest in controlling unsolicited commercial bulk e-mail as well as fraudulent or otherwise illegal e-mail. Nevertheless, Code § 18.2-152.3:1 is not limited to instances of commercial or fraudulent transmission of e-mail, nor is it restricted to transmission of illegal or otherwise unprotected speech such as pornography or defamation speech. Therefore, viewed under the strict scrutiny standard, Code § 18.2-152.3:1 is not narrowly tailored to protect the compelling interests advanced by the Commonwealth.

### 4. SUBSTANTIAL OVERBREADTH

The Commonwealth argues that we should not preclude enforcement of Code § 18.2-152.3:1 because, even if unconstitutionally overbroad, that remedy is limited to those statutes that are substantially overbroad. The concept of substantial overbreadth is not a test of the constitutionality of a statute, but a policy related to the remedy flowing from a successful facial challenge. A successful facial overbreadth challenge precludes the application of the affected statute in all circumstances. Recognizing the sweep of this remedy, the

24

United States Supreme Court has stated that it will not impose such an expansive result where the chilling effect of an overbroad statute on constitutionally protected rights cannot justify prohibiting all enforcement of the law. "For there are substantial social costs created by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech. . . ." Hicks II, 539 U.S. at 119. Thus a statute should be declared facially overbroad and unconstitutional only if the statute "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " Id. at 118-19 (citing Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

The Commonwealth argues that Code § 18.2-152.3:1 is not substantially overbroad because it does not impose any restrictions on the content of the e-mail and "most" applications of its provisions would be constitutional, citing its application to unsolicited bulk commercial e-mail, unsolicited bulk e-mail that proposes a criminal transaction, and unsolicited bulk e-mail that is defamatory or contains obscene images. According to the Commonwealth an "imagine[d] hypothetical situation where the Act might be unconstitutional as applied does not render the Act substantially overbroad."

25

The United States Supreme Court recently reviewed the First Amendment overbreadth doctrine in United States v. Williams, 553 U.S. ___, 128 S.Ct. 1830 (2008).  The Court noted

> [i]n order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.
>
> . . . [I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers.

553 U.S. at ___, 128 S.Ct. at 1838.  Applying that inquiry under Williams in this case is relatively straightforward as Code § 18.2-152.3:1 would prohibit all bulk e-mail containing anonymous political, religious, or other expressive speech.  For example, were the Federalist Papers just being published today via e-mail, that transmission by Publius would violate the statute.  Such an expansive scope of unconstitutional coverage is not what the Court in Williams referenced "as the tendency of our overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals."  553 U.S. at ___, 128 S.Ct. at 1843. We thus reject the Commonwealth's argument that Jaynes' facial challenge to Code § 18.2-152.3:1 must fail because the statute is not "substantially overbroad."

### 5. NARROWING CONSTRUCTION

Lastly, the Commonwealth asserts that we need not declare Code § 18.2-152.3:1 unconstitutional because a limiting

26

construction can be adopted by this Court that would prevent invalidating the statute. Such a construction according to the Commonwealth would be a declaration that the statute does not apply to "unsolicited bulk non-commercial e-mail that does not involve criminal activity, defamation or obscene materials." Alternatively the Commonwealth suggests that we hold the statute applies only in instances where the receiving Internet service provider "actually objects to the bulk e-mail."

Our jurisprudence requires us to interpret a statute to avoid a constitutional infirmity. Burns v. Warden, 268 Va. 1, 2, 597 S.E.2d 195, 196 (2004). Nevertheless, construing statutes to cure constitutional deficiencies is allowed only when such construction is reasonable. Virginia Soc'y for Human Life v. Caldwell, 256 Va. 151, 157, 500 S.E.2d 814, 816-17 (1998). A statute cannot be rewritten to bring it within constitutional requirements. Reno v. ACLU, 521 U.S. 844, 884-85 & nn.49-50 (1997); Virginia v. American Booksellers Ass'n, 484 U.S. 383, 397 (1988). The construction urged by the Commonwealth is not a reasonable construction of the statute. Nothing in the statute suggests the limited applications advanced by the Commonwealth. If we adopted the Commonwealth's suggested construction we would be rewriting Code § 18.2-152.3:1 in a material and substantive way. Such a task lies within the province of the General Assembly, not the courts. Jackson v.

27

<u>Fidelity & Deposit Co.</u>, 269 Va. 303, 313, 608 S.E.2d 901, 906 (2005) ("Where the General Assembly has expressed its intent in clear and unequivocal terms, it is not the province of the judiciary to add words to the statute or alter its plain meaning.").

## III.  CONCLUSION

For the foregoing reasons, we hold that the circuit court properly had jurisdiction over Jaynes.  We also hold that Jaynes has standing to raise a First Amendment overbreadth claim as to Code § 18.2-152.3:1.  That statute is unconstitutionally overbroad on its face because it prohibits the anonymous transmission of all unsolicited bulk e-mails including those containing political, religious or other speech protected by the First Amendment to the United States Constitution.  Accordingly, we will reverse the judgment of the Court of Appeals and vacate Jaynes' convictions of violations of Code § 18.2-152.3:1. [13]

<u>Reversed and final judgment.</u>

---

[13] In light of this holding, we do not address Jaynes' other assignments of error.