COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Beales, Friedman and Callins
Argued at Leesburg, Virginia


ADAM MARCUS GRIFFIN

                                                            OPINION BY
v.        Record No. 0042-23-4               JUDGE RANDOLPH A. BEALES
                                                         FEBRUARY 13, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF WINCHESTER
Brian M. Madden, Judge

Howard J. Manheimer (Matthew Kreitzer, on brief), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury found Adam Marcus Griffin guilty of first-degree murder, use of a firearm in the

commission of a felony, possession of a firearm by a convicted felon, and solicitation of murder.

On appeal, Griffin argues that the trial court erred by granting the Commonwealth's motion to *nolle*

*prosequi* his prior indictments "without a sufficient showing of good cause" and by allowing the

Commonwealth to reinstitute the charges. Griffin also argues that the trial court erred by denying

his motion to dismiss the solicitation of murder charge based on lack of venue.

## I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of

the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth

and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

A multi-jurisdictional grand jury (MJGJ) indicted Griffin on the charges of first-degree murder, use of a firearm in the commission of a felony, and possession of a firearm by a violent convicted felon. Griffin was separately indicted by a Winchester grand jury on the charge of solicitation of murder. Griffin moved the Circuit Court of the City of Winchester to dismiss the three MJGJ indictments without prejudice, asserting that the MJGJ "that handed down the indictments lacked impartiality, and there is grave doubt that the decision to indict was free from influences that rendered the MJGJ impartial." The trial court denied Griffin's motion, but it allowed Griffin to "file under seal any documents or written proffers relevant to their motion to preserve the issues for a possible appeal."

The Commonwealth then moved to *nolle prosequi* the three MJGJ indictments. Although the Commonwealth "adamantly denies that anything improper occurred during the MJGJ proceedings and asserts that the indictments were supported by probable cause arising solely from sworn testimony," it moved to *nolle prosequi* the three MJGJ indictments "in an abundance of caution." The Commonwealth noted that a *nolle prosequi* would provide Griffin the relief he sought in his motion to dismiss — dismissal of the three MJGJ indictments. In addition, the Commonwealth emphasized that Griffin would not be prejudiced by the motion to *nolle prosequi* because he was being held without bond on the solicitation of murder charge that had been handed down separately by the Winchester grand jury. The trial court granted the Commonwealth's motion and noted Griffin's objection. The Commonwealth indicated that it would seek new indictments for the same three charges from a different grand jury that same day, thereby enabling the parties to keep their previously set trial dates. Later that same day, a Winchester grand jury indicted Griffin on the same three charges that had been *nolle prosequied*.

Griffin then moved to dismiss the new charges on the grounds that the earlier charges had been "improperly dismissed by Order of *nolle prosequi* in violation of his due process as guaranteed by the 14th Amendment to the US Constitution." Griffin asserted that "the *nolle prosequi* Order deprived Defendant of the benefit of getting credit for the time that he had served on these charges" and that the trial court "in granting the Motion for *nolle prosequi* implicitly advised the Defendant that he could only avoid suffering an Order of *nolle prosequi* if he withdrew his objections to the Motion to Dismiss." The trial court denied Griffin's motion, noting that the new charges were identical to the charges that had been *nolle prosequied*. The trial court also found that, under a recent amendment to Code § 53.1-187, Griffin would receive credit for the time he had served awaiting trial on the original charges.

The case then went to trial, and the evidence established that on the night of June 30, 2020, Griffin — who was known by his street name "Loco" — fatally shot Lorenzo Wheeler ("Zoe") after Wheeler exited his car near Erik Carter's ("Big E") home in Winchester. Carter testified that on the night after the shooting, he told Griffin that the murder "was F'd up. Because the blame, everybody was pointing the finger at me like it was my fault. The neighbors, my mom, the police." Carter testified that Griffin said "he [Griffin] was going to take care of it. Basically he was going to own up to what he did."

Michael Richards, who was incarcerated with Griffin in Frederick County while Griffin was awaiting his trial, also testified at trial. Richards noted that both he and Griffin were affiliated with the same street gang, the Latin Kings. While incarcerated, Griffin initially told Richards that "he [Griffin] was being investigated for the murder of Wheeler." Richards testified, "[W]hen we got on the subject of him shooting Wheeler, you know, he told me the reason why he done it. You know, pretty much because he got into an argument with Wheeler." Griffin also told Richards that he had disposed of the murder weapon, stating that he had "put it

- 3 -

in the Hudson." Richards testified that Griffin then revealed to him that "the only one he [Griffin] was worried about at the time was Big E, which is Erik Carter. Because Erik was out there at the time this supposed to happen." Griffin explained to Richards that "Big E was mad at him for blaming him for the authorities running up on his mom's house." Richards testified that Griffin said that "he should have never let Erik Carter turn a corner. He should have shot him too." Noting that Griffin wanted him to enlist the help of other Latin Kings members to kill Carter, Richards recalled:

> He [Griffin] said without E [Carter] being around he didn't have nothing else to worry about. He said he had his . . . He actually said he had his brother down from New York looking for Big E and his brother couldn't find him and had to go back. So he asked me if I had any Latin Kings around the area. I told him nah, I knew some in the surrounding areas and I asked him why and at that time he said because he wanted Big E taken care of. I said do you know what you are asking me and he was like yeah, I know what I am asking you. I want him killed.

Richards later disclosed his conversation with Griffin to the police. After speaking with the authorities, Richards contacted Stephanie Waller, the mother of Griffin's child, to confirm whether Griffin was in fact serious about killing Carter. Richards messaged Waller through a "jail visit app," and Waller relayed his messages to Griffin through the same messaging application. Waller, in turn, informed Richards about Griffin's responses. The following text message conversations transpired, first between Richard and Waller on September 19, 2020:

> [Richards]: Stef" how you doing? this mike…how is my bro Lo" ?I know he still holding it down…look I need for you to get at him ASAP" let him know that one of the bro's got a line on the problem (E.C.) ask him everything still green with that???? I need to know ASAP so I can let the bro know like tonight

> [Richards]: I told him I was on it,tell him he's ! my bro and I got him on what ever"" and whoever """"

> [Richards]: all he got to do is tell me if it's still a yes.?

Waller then exchanged the following text messages with Griffin that same day:

[Waller]:	I just don't feel like myself today. I feel really tired. Anyway Mike said that he got a line on the problem and wanted to know is everything still green? And let him no if it's still a yes

[Waller]:	He said that you're his bro and he got you on whoever and whatever

[Griffin]:	thank you my love, you need to get some rest my loving wife. please let him know yes still green . amor de rey . also , did the money hit on Brian and Jeffrey's account??? I appreciate everything that you do for me and our family. ;-) :-) :-) :-) :-* :-* :-*

After receiving confirmation from Griffin, Waller and Richards then resumed their text message

conversation on September 19, 2020, and September 21, 2020:

[Waller]:	I'm doing ok thanks for a asking. He said yes everything is still green. Amor de rey

[Richards]:	I'm on the job enough said ..Armor de rey

[Richards]:	Stef tell bro that our other bro just got at me through my wife telling me to give him a call about 2:30 so he can give me a up date on the E.C. situation as soon as I talk to him I'll give you a text or call so you can update Adam, tell him keep his head up and stay strong I got him. Armor de rey

[Richards]:	Amor de rey

[Waller]:	I sent him the message he said aight amor de rey

[Richards]:	hey I need for you to let me know when I can give you a call

[Waller]:	You can call me now

[Richards]:	okay

[Waller]:	Sent

[Richards]:	was on the phone with wife just got message.. let him know I will keep him updated… tell him I said stay safe and keep his head up…. Amor de rey… p.s. tell him to get at me if he need anything

[Waller]:	Ok I'll let him know

- 5 -

Waller then relayed Richards's update to Griffin on September 21, 2020:

[Waller]: Mike said he just got in touch with your other bro through his wife telling him to give him a call around 2:30 so he can give him an update on the situation. As soon as he talks to him he will give you an update. He said keep your head up and stay strong. Amor de rey

[Griffin]: thank you my love . can you call me on video please:-) :-) :-) :-) :-) :-) :-) :-) :-) :-) :-)

[Waller]: I don't know what it is that you've done to me. But it had caused me to act in such a crazy way <3

Richards also asked Griffin, through Waller, to provide him with a photograph of and address for Carter. Waller testified that she was in her Winchester home when she exchanged the aforementioned text messages with Griffin and Richards.

At the conclusion of the Commonwealth's evidence, Griffin moved to strike the solicitation of murder charge, arguing, "The solicitation charge is based on alleged solicitation between Mr. Griffin, that Mr. Griffin solicited Mr. Richards to kill Erik Carter. The evidence is that that conversation, the entire conversation between the two of them happened in the jail and the jail is not in the City of Winchester. The jail is in Frederick County." The trial court denied Griffin's motion to strike, explaining:

> In this case the venue could be held in Frederick County where Mr. Griffin allegedly had this conversation with Mr. Richards and asked that a contract be put out on an individual who Mr. Griffin believed to be a witness. However, the Court does find that the Commonwealth should have the ability to charge this particular crime in any jurisdiction where there was "a continuation" of the solicitation. In this case, the hook here is the contact with a resident of the City of Winchester asking for the assistance in the solicitation crime.

Griffin presented evidence and renewed his motion to strike. The trial court denied Griffin's renewed motion to strike. Following deliberations, the jury convicted Griffin of first-degree murder, use of a firearm in the commission of a felony, possession of a firearm by a felon, and solicitation of murder. The trial court then sentenced Griffin to life in prison, plus 28

years, with 15 years suspended. The sentencing order credited Griffin for the time he had served while awaiting trial on the *nolle prosequied* charges, providing:

> The defendant will be given credit for time spent in confinement while awaiting trial pursuant to Virginia Code § 53.1-187. Such credit for time shall include any time spent in pretrial confinement or detention on separate, dismissed, or nolle prosequi charges that are from the same act as the violation for which the person is convicted and sentenced to a term of confinement.

Griffin now appeals to this Court.

## II. ANALYSIS

### A. *Nolle Prosequi*

Griffin argues on appeal to this Court, "The Trial Court erred in granting the Commonwealth's Motion for nolle prosequi on Appellant's prior indictments for Murder, Use of a Firearm in Commission of a Felony, and Felon in Possession of a Firearm (Case Nos. CR20-538 - 540) without a sufficient showing of good cause, and by allowing the superseding charges (CR21-514-516) to proceed to trial." Griffin relies on this Court's decision in *Battle v. Commonwealth*, 12 Va. App. 624 (1991), to argue that the trial court "violated his right to Due Process as guaranteed by the 14th Amendment to the U.S. Constitution" by limiting his choices to either the charges being *nolle prosequied* or his withdrawing his motion to dismiss the charges, which he claimed would cause him to lose credit for time served on the pending charges.

The Supreme Court has stated, "[T]he granting of a motion for *nolle prosequi* will only be overturned if there is clear evidence that the decision to grant the motion was not judicially sound." *Harris v. Commonwealth*, 258 Va. 576, 583 (1999). Code § 19.2-265.3 provides, "Nolle prosequi shall be entered only in the discretion of the court, upon motion of the Commonwealth with good cause therefor shown." "The express language of the statute commits a finding of good cause to the discretion of the trial court." *Harris*, 258 Va. at 583. The

Supreme Court has explained that a *nolle prosequi* "discharges the accused from liability on the indictment to which the *nolle prosequi* is entered," *Miller v. Commonwealth*, 217 Va. 929, 935 (1977), but it "generally does not act as an acquittal," *Commonwealth v. Garrett*, 276 Va. 590, 606 (2008). A *nolle prosequi*, therefore, serves "to discontinue the prosecution relative to the charges." *Cook v. Commonwealth*, 268 Va. 111, 114 (2004). "For the prosecution to proceed thereafter for the same offense, a new indictment is required." *Miller*, 217 Va. at 935. This "new indictment is a *new* charge, distinct from the original charge or indictment." *Harris*, 258 Va. at 585 (emphasis added).

This Court has "noted the presumption that a trial court has properly followed the law" and has "declined to hold that a subsequent prosecution was absolutely barred merely because the record did not reflect any affirmative finding of 'good cause' for an earlier *nolle prosequi* of the same charges." *Moore v. Commonwealth*, 59 Va. App. 795, 807 (2012) (citing *Duggins v. Commonwealth*, 59 Va. App. 785 (2012)). However, this Court has also cautioned, "Under limited circumstances, a *nolle prosequi* could implicate a bar to subsequent prosecution. For example, the constitutional prohibition against double jeopardy might be triggered if a *nolle prosequi* is granted after jeopardy attaches." *Duggins*, 59 Va. App. at 792 (citing *Rosser v. Commonwealth*, 159 Va. 1028, 1032 (1933)). "In addition, a *nolle prosequi* could contribute toward a prejudicial delay in violation of a defendant's constitutional speedy trial protections extended by the Sixth Amendment." *Id.* (citing *Harris*, 258 Va. at 585-86). "Finally, when a *nolle prosequi* is used as an unconstitutional weapon of prosecutorial misconduct, subsequent 'enhanced charges' could be dismissed as a remedy for the constitutional violation." *Id.* (citing *Battle*, 12 Va. App. at 631-32).

In *Battle*, the trial court denied the defendant's request for a continuance but agreed to bar the use of a certain piece of evidence. 12 Va. App. at 628. The Commonwealth then threatened

to move to *nolle prosequi* the defendant's charges and bring future, more severe charges unless the defendant withdrew his objection to the evidence that had already been suppressed by the trial court. *Id.* When the defendant refused to forego the favorable evidentiary ruling, the trial judge granted the Commonwealth's motion to *nolle prosequi* the charges over the defendant's objection. *Id.* The Commonwealth later obtained indictments against the defendant on more serious charges. *Id.* The defendant then "moved to dismiss the indictments on the grounds that the bringing of more serious charges represented prosecutorial vindictiveness," but the trial court denied the motion. *Id.* On appeal, this Court reversed, holding, "The threat of nolle prosequi in order to increase the prosecutorial risk to a defendant cannot be used as a sword to force a defendant to relinquish an advantage obtained by a favorable judicial ruling." *Id.* at 630.

Here, in contrast to the factual circumstances in *Battle*, Griffin had not obtained a favorable ruling when the Commonwealth moved to *nolle prosequi* the charges as the trial court had denied his motion to dismiss. In addition, the record contains no evidence of prosecutorial vindictiveness as the Commonwealth reindicted Griffin on new charges that were identical to those that had been *nolle prosequied*. *See Duggins*, 59 Va. App. at 792 n.6 ("Despite finding prosecutorial misconduct, *Battle* did not bar the reprosecution of the *original* charge." (citing *Battle*, 12 Va. App. at 631-32)). Despite Griffin's claim of prejudice, the Commonwealth's decision to *nolle prosequi* the three MJGJ indictments provided Griffin the very relief he had sought in his motion to dismiss — dismissal of the original charges without prejudice. Furthermore, Griffin served no additional time in jail awaiting trial because the Commonwealth obtained new indictments on the same charges the same day that it *nolle prosequied* the original

- 9 -

charges, and the parties retained their previously continued trial dates.[1]  Consequently, for all of these reasons, the trial court did not err by granting the Commonwealth's motion to *nolle prosequi* the three MJGJ indictments and by allowing the new charges to proceed to trial.

## B.  Venue

Griffin also argues on appeal to this Court, "The trial Court erred in denying Appellant's Motion to dismiss the solicitation charge (CR21-19) based on lack of venue."  Griffin contends that "any alleged solicitation committed by Appellant occurred in Frederick County and therefore venue was not proper in Winchester."

This Court has often stated, "[A]n appellate court's responsibility when reviewing an issue of venue is 'to determine whether the evidence, when viewed in the light most favorable to the Commonwealth, is sufficient to support the [trial court's] venue findings.'"  *McGuire v. Commonwealth*, 68 Va. App. 736, 741 (2018) (quoting *Bonner v. Commonwealth*, 62 Va. App. 206, 211 (2013) (*en banc*)).  "In a criminal prosecution, it is the Commonwealth's burden to establish venue."  *Bonner*, 62 Va. App. at 210.  "The Commonwealth may prove venue by either direct or circumstantial evidence."  *Davis v. Commonwealth*, 14 Va. App. 709, 711 (1992).  "As venue is not a substantive element of a crime," this Court has noted that "the Commonwealth is not required to 'prove where the crime occurred beyond a reasonable doubt.'"  *McGuire*, 68 Va. App. at 741 (quoting *Bonner*, 62 Va. App. at 210).  Rather, "the Commonwealth need only produce evidence sufficient to give rise to a 'strong presumption' that the offense was committed within the jurisdiction of the court."  *Bonner*, 62 Va. App. at 211 (quoting *Cheng v. Commonwealth*, 240 Va. 26, 36 (1990)) (some internal quotation marks omitted).

---

[1] In any event, the record clearly demonstrates that Griffin was still being held without bond anyway on the separate solicitation of murder charge that was not *nolle prosequied*, and the final sentencing order explicitly states that he received credit for the time served while awaiting trial on the first set of charges.

Griffin was convicted of solicitation of murder in the City of Winchester. "Criminal solicitation involves the attempt of the accused to incite another to commit a criminal offense." *Branche v. Commonwealth*, 25 Va. App. 480, 490 (1997). The Supreme Court has stated that there is no requirement that the defendant "proceed to the point of some overt act in the commission of crime." *Wiseman v. Commonwealth*, 143 Va. 631, 638 (1925). In addition, this Court has explained that an "act of solicitation may be completed before any attempt is made to commit the solicited crime." *Brooker v. Commonwealth*, 41 Va. App. 609, 614 (2003) (quoting *Ford v. Commonwealth*, 10 Va. App. 224, 226 (1990)). However, the Supreme Court has clarified, "Solicitation may comprise a course of conduct, intended to induce another to act, that continues over an extended period." *Huffman v. Commonwealth*, 222 Va. 823, 826 (1981) (quoting *Pederson v. Richmond*, 219 Va. 1061, 1067 (1979)).

Code § 19.2-244(A) provides that "the prosecution of a criminal case shall be had in the county or city in which the offense was committed." This Court has noted, "Venue may be appropriate in more than one jurisdiction in cases involving 'a number of actions which must be taken by more than one person.'" *McGuire*, 68 Va. App. at 742 (quoting *Kelso v. Commonwealth*, 282 Va. 134, 138 (2011)). "In cases involving criminal acts occurring in multiple jurisdictions, Virginia courts have analyzed 'the nature of the crime charged and the location of the acts constituting the crime' in order to determine where venue was proper." *Id.* Accordingly, this Court's venue determination "requires an examination of the elements of a crime and 'a determination of where [the] specific crime was "committed."'" *Id.* at 741 (quoting *Kelso*, 282 Va. at 137).

Here, the evidence was sufficient to create a strong presumption that the solicitation offense began in the jail in Frederick County and then continued in the City of Winchester. The evidence established that Griffin's solicitation of Richards to murder Carter consisted of several

acts that occurred over a period of time. After Richards dismissed Griffin's original solicitation to kill Carter, Richards sought confirmation that Griffin was serious about his proposal. As Griffin and Richards were no longer housed together in the jail in Frederick County, Griffin confirmed the solicitation through an intermediary, Waller (the mother of his child), who was located in Winchester. The solicitation was only confirmed once Waller relayed to Richards that Griffin remained committed to his proposal to murder Carter — i.e., confirming Griffin's intent that Richards should actually follow through with arranging for the murder of Carter, instead of their simply just talking about it. Therefore, the solicitation continued and was completed through Waller's communications with Richards on Griffin's behalf in Winchester. *See Jaynes v. Commonwealth*, 276 Va. 443, 452 (2008) ("It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which the evil is the fruit." (quoting *Travelers Health Ass'n v. Commonwealth*, 188 Va. 877, 892 (1949))). Consequently, the record before us on appeal supports the trial court's determination that venue was proper in the City of Winchester.

### III.  CONCLUSION

In short, the trial court did not err by granting the Commonwealth's motion to *nolle prosequi* the three MJGJ indictments as there was no evidence in the record of prosecutorial vindictiveness or prejudice to Griffin. The Commonwealth's decision to *nolle prosequi* the three MJGJ indictments resulted in the dismissal of Griffin's original charges without prejudice — the same relief Griffin had sought in his motion to dismiss — and Griffin received credit for his time served while awaiting trial on the original charges. In addition, the evidence was sufficient to give rise to a strong presumption that Griffin's solicitation of murder offense was committed within the jurisdiction of the City of Winchester. The record reflects that Griffin's solicitation of

Richards to murder Carter consisted of a course of conduct that continued over an extended period.  Griffin's solicitation continued and was only confirmed through Waller as the intermediary between Griffin and Richards — all while Waller was at her home in Winchester.  Accordingly, venue was proper in the City of Winchester.

For all of the foregoing reasons, we affirm the trial court's judgment and uphold Griffin's convictions.

*Affirmed.*